UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

OLIVER NISSAN AWSHANA,
ALI NAJIM AL-SADOON,
and WISAM GHARIB HAMANA,

                Plaintiffs,                        Case Number 20-10699
v.                                       Honorable David M. Lawson

REBECCA ADDUCCI, Detroit District
Director, United States Immigration and
Customs Enforcement, MATTHEW T. ALBENCE,
Director, United States Immigration and
Customs Enforcement, KEVIN MCALEENAN,
Secretary of the United States Department of
Homeland Security, and WILLIAM P. BARR,
United States Attorney General.

                Respondents.
_____/

## OPINION AND ORDER DENYING IN PART PETITION
## FOR WRIT OF HABEAS CORPUS

"[W]hen the State takes a person into its custody and holds him there against his will, the

Constitution imposes upon it a corresponding duty to assume some responsibility for his safety

and general wellbeing." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (citation omitted). Citing

concerns for their safety due to potential exposure to the novel coronavirus and contracting

COVID-19, petitioners Oliver Nissan Awshana, Ali Najim Al-Sadoon, and Wisam Gharib

Hamana, Iraqi refugees currently detained by the United States Immigration Customs and

Enforcement Agency ("ICE"), ask this Court to order their release in a petition for a writ of habeas

corpus filed under 28 U.S.C. § 2241. They base their petition on a vague reference to an

undeveloped theory of substantive due process embodied in the Fifth Amendment. The

government opposes their request due in part to their criminal histories that would disfavor release

under normal circumstances. But these are not normal times, and the Court has the authority to

order the petitioners' release if their continued detention violates a constitutional right for which the only remedy is release. Nonetheless, the present circumstances do not warrant relief: there are no confirmed or suspected COVID-19 cases in the one of detention facilities mentioned in the petition, and none of the petitioners are burdened with conditions that place them in an enhanced risk category. The petition will be denied in part, but it may be renewed if conditions change. The respondents promptly must furnish additional information about the conditions at the St. Clair County Detention Facility, where COVID-19 cases have been reported.

## I. The Petition

Although the petitioners have styled their petition as an "emergency," they have not moved for a temporary restraining order or preliminary injunction or any other form of immediate consideration. The petition cites no legal authority except for references to 28 U.S.C. § 2241. The petitioners filed no memorandum of law to support their request. And they have not coupled their petition with any claim for violations of their constitutional rights under, for example, *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

The government believes that the petitioners' exclusive reliance on section 2241 is fatal to their claim. Generally, section 2241 provides a remedy for prisoners and detainees in two circumstances: (1) to "challeng[e] the execution of a sentence," and (2) to "test the legality of a detention where [28 U.S.C.] § 2255 is otherwise inadequate." *Terrell v. United States*, 564 F.3d 442, 447-48 (6th Cir. 2009). The government characterizes the petition as a challenge to the petitioners' conditions of confinement. It argues that section 2241 cannot provide a basis for relief for such a challenge.

It is generally accepted in this circuit that section 2241 "is not the proper vehicle for a prisoner to challenge conditions of confinement." *Luedtke v. Berkebile*, 704 F.3d 465, 466 (6th

Cir. 2013) (citing *Martin v. Overton,* 391 F.3d 710, 714 (6th Cir. 2004)). That is because the purpose of a writ of habeas corpus is to contest "the very fact or duration of . . . physical imprisonment." *Lutz v. Hemingway*, 476 F. Supp. 2d 715, 718 (E.D. Mich. 2007). It is employed when "the relief that [a petitioner] seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment." *Ibid.* (citing *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973)). If the remedy a detainee is seeking is a change in the *conditions* of his custody arrangements, or to obtain compensation for past unconstitutional conditions of confinement, then he must file an action under 42 U.S.C. § 1983, or for a federal detainee, under *Bivens*. *Ibid.*

The petitioners here, however, are not seeking to change the conditions of their confinement or to obtain damages for past constitutional violations. Instead, they describe the close living conditions typical of custodial confinement, they recount the current commands for social distancing necessary to inhibit the spread of the novel coronavirus, and they argue that no custodial condition will protect them from infection. Therefore, they argue, the *only* remedy that will vindicate their due process right under the Fifth Amendment is release from custody.

That form of relief falls squarely within the prevue of section 2241. "The statute is an affirmative grant of power to federal courts to issue writs of habeas corpus to prisoners being held 'in violation of the Constitution or laws or treaties of the United States.'" *Rice v. White*, 660 F.3d 242, 249 (6th Cir. 2011) (quoting 28 U.S.C.§ 2241(c)). Courts generally look to the form of relief sought when deciding if section 2241 is applicable. In cases involving medical decisions, sometimes fine distinctions must be drawn. *See Glaus v. Anderson*, 408 F.3d 382, 388 (7th Cir. 2005) (distinguishing between a section 2241 petitioner who requests a "quantum change in the level of custody, which must be addressed by habeas corpus," and a petitioner who requests "a different program or location or environment, which raises a civil rights claim" and holding that

"[i]f an inmate establishe[s] that his medical treatment amounts to cruel and unusual punishment, the appropriate remedy would be to call for proper treatment, or to award him damages; release from custody is not an option." (citation omitted)); *cf. Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979) ("[L]eav[ing] to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of the confinement itself." (citation omitted)).  But section 2241 has been pressed into service in medical condition cases where the line of demarcation is fuzzy.  *See Roba v. United States*, 604 F.2d 215, 218-19 (2d Cir. 1979) (allowing a section 2241 petition to challenge an inmate's "transfer while seriously ill" where that transfer posed a risk of fatal heart failure).

Other courts that have granted relief to detainees based on the current pandemic have relied on section 2241 for their authority.  Most of them, however, also have considered coordinated requests for a temporary restraining order and the attending relevant equitable factors.  *See Jones v. Wolf*, No. 20-361, 2020 WL 1643857 (W.D.N.Y. Apr. 2, 2020); *Basank v. Decker*, No. 20-2518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020); *Coronel v. Decker*, ---F.Supp.3d---, 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020).

The petitioners allege that their continued detention violates their constitutional right under the Fifth Amendment, which forbids depriving a person of life, liberty, or property without due process of law.  They contend that their continued detention will compromise their health and may kill them.  They are entitled to advance their claim — and seek release from custody — under section 2241.

## II.  Immigration Status and Constitutional Detention

The petitioners are natives and citizens of Iraq admitted at various times to the United States as refugees.  The statuses of Awshana and Hamana were adjusted to lawful permanent

residents. All three were placed in removal proceedings because of criminal convictions. And all eventually were scheduled for deportations, which were stayed when Immigration Judges granted requests for withholding of removal under the Immigration and Naturalization Act, the United Nations Convention Against Torture, or both.

Congress has prescribed that once an alien has been ordered to be deported, "the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the 'removal period')." 8 U.S.C. § 1231(a)(1)(A). During this removal period, "the Attorney General shall detain the alien." *Id*. § 1231(a)(2). Congress has authorized the Attorney General (now the Secretary of the Department of Homeland Security) to detain certain aliens beyond the 90-day removal period under certain circumstances. *Id*. § 1231(a)(6). "By its terms, this provision applies to three categories of aliens: (1) those ordered removed who are inadmissible under § 1182, (2) those ordered removed who are removable under § 1227(a)(1)(C), § 1227(a)(2), or § 1227(a)(4), and (3) those ordered removed whom the Secretary determines to be either a risk to the community or a flight risk." *Clark v. Martinez*, 543 U.S. 371,377 (2005). The petitioners here all fall within the second category, and possibly the third as well.

Detention of removable aliens, however, must be consistent with the Constitution. The protection of the Fifth Amendment's Due Process Clause applies to "all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). The petitioners allege that their continued detention during the COVID-19 pandemic violates their substantive rights under the Due Process Clause of the Fifth Amendment to the United States Constitution because it jeopardizes their health and medical wellbeing.

It is well known that the State "has an 'obligation to provide medical care for those whom it is punishing by incarceration.'" *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling*, 509 U.S. at 31.

However, claims by detainees for due process violations emanating from confinement conditions are not strictly governed by the Eighth Amendment, because the detainees do not stand convicted and are not subject to punishment. *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983). A detainee's rights are at least as great as the Eighth Amendment protections available to a convicted prisoner. *Jones v. Blanas*, 393 F.3d 918, 933-34 (9th Cir. 2004) (holding that civil detainees are entitled to superior conditions of confinement than prisoners and pretrial detainees). Nonetheless, claims relating to health concerns by detainees are analyzed using an Eighth-Amendment, deliberate-indifference framework. *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001).

That framework calls for proof that detention officials were deliberately indifferent to a substantial risk of harm. *Farmer v. Brennan*, 511 U.S. 825, 837–38 (1994). The applicable test has two elements. *Id.* at 834. First, the petitioners must demonstrate that the constitutional deprivation was "objectively, 'sufficiently serious.'" *Ibid.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Second, they must demonstrate that the detention official had a "sufficiently culpable state of mind." *Ibid.* This element can be proven by circumstantial evidence from which the fact finder can conclude that the state actor perceived the risk, *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001), or "from the very fact that the risk was obvious." *Terrance v. Northville Reg'l Psychiatric Hospital*, 286 F.3d 834, 843 (6th Cir. 2002).

In *Helling v. McKinney*, the Supreme Court held that a prisoner could state a claim under the Eighth Amendment by alleging that officials "exposed him to levels of [environmental tobacco smoke] that pose[d] an unreasonable risk of serious damage to his future health." 509 U.S. at 35. To satisfy the objective prong, the plaintiff had to show both that he was "being exposed to unreasonably high levels of [environmental tobacco smoke]" and that "society consider[ed] the risk that the prisoner complain[ed] of to be so grave that it violate[d] contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Id.* at 35, 36 (emphasis in original). The plaintiff must produce "more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood [of] injury." *Id.* at 36. To succeed on the subjective prong, the plaintiff had to show that "the prison authorities' current attitude and conduct" amounted to deliberate indifference. *Ibid.*

However, "a remedy for unsafe conditions need not await a tragic event," and the plaintiff need not allege present harm to succeed on an unconstitutional conditions claim. *Id.* at 33. In *Helling*, the Court rejected the government's argument that the plaintiff's claim was not cognizable because he had not alleged any present harm. The Court explained that the government may not "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Ibid.* The Court noted some examples of circumstances where inmates may obtain injunctive relief to remedy life-threatening conditions even though "nothing yet had happened to them." *Ibid.* One example was the "exposure of inmates to serious, communicable disease [even if the] inmate shows no serious current symptoms." *Ibid.*

### III. COVID-19 Pandemic and Detention Facilities
#### A. Novel Coronavirus in Michigan

On March 22, 2020, the Governor of Michigan announced that "[t]he novel coronavirus (COVID-19) is a respiratory disease that can result in serious illness or death. It is caused by a

new strain of coronavirus not previously identified in humans and easily spreads from person to person. There is currently no approved vaccine or antiviral treatment for this disease." Executive Order, No. 2020-20, Mar. 22, 2020, https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-522626--,00.html. Dr. Anthony Fauci, director of the National Institute of Allergy and Infectious Diseases, estimated that between 100,000 and 240,000 people will die from COVID-19 related complications. Michael D. Shear et al., *Coronavirus May Kill 100,000 to 240,000 in U.S. Despite Actions, Officials Say*, N.Y. Times, Mar. 31, 2020, https://www.nytimes.com/2020/03/31/us/politics/coronavirus-death-toll-united-states.html.

The Centers for Disease Control and Prevention (CDC) advised that "[p]eople aged 65 years and older" might be at higher risk for severe illness from COVID-19. *See People Who Are at Higher Risk for Severe Illness*, Ctrs. for Disease Control and Prevention (Mar. 31, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html? CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019ncov%2Fspecific-groups%2Fhigh-risk-complications.html. The CDC identified other high-risk conditions, which include: [p]eople with chronic lung disease or moderate to severe asthma[; p]eople who have serious heart conditions[; p]eople who are immunocompromised...[; p]eople of any age with severe obesity (body mass index [BMI] of 40 or higher)[; p]eople with diabetes[; p]eople with chronic kidney disease undergoing dialysis[; or p]eople with liver disease." *People Who Are at Higher Risk for Severe Illness, supra*.

On March 10, 2020, the Governor of Michigan announced the state's first two cases of COVID-19 and simultaneously declared a state of emergency. Executive Order, No. 2020-4 (Mar. 10, 2020). The number of new cases is growing exponentially. As of today, that number is now at 20,346 confirmed cases and 959 known related deaths. *See* Coronavirus, Michigan.Gov,

https://www.michigan.gov/coronavirus/0,9753,7-406-98163-520743--,00.html. COVID-19 has a high risk of transmission, and the number and rate of confirmed cases indicate broad community spread. *Ibid.*

## B. ICE Detention Facilities

The parties paint very different pictures of the conditions within the ICE detention facilities. The government argues that the situation is no worse than what is occurring throughout the rest of the world. But the petitioners argue that the packed, unsanitary conditions at the facilities are completely inadequate, warning that they will become breeding grounds for the disease.

### 1. ICE Facility Conditions

As of March 30, 2020, when the respondents filed their answer to the petition, there have been no suspected or confirmed cases of COVID-19 in either the Calhoun or St. Clair County detention centers. However, the Court learned from the U.S. Marshal Service that confirmed cases were reported by the St. Clair County Jail on April 8, 2020. The petitioners argue that the poor conditions in the facility will compromise their safety and that exposure to the virus while detained within ICE's facilities is inevitable.

Relying on the following articles from major news outlets, the petitioners believe that ICE detention facilities are rife with overcrowding, neglect, and substandard conditions, making them hotbeds for the virus:

1. Human Rights Watch & American Civil Liberties Union, *Code Red: The Fatal Consequences of Dangerously Substandard Medical Care in Immigration Detention* (June 2018) ECF No. 1-4. (Since March 2010, 74 detainees have died in ICE custody; medical care lapses contributed to 23 of them);

2. Amanda Holpuch, *Coronavirus Inevitable in Prison-Like US Immigration Centers, Doctors Say*, THE GUARDIAN, ECF No. 1-5;

3. *Former ICE Director: Release Immigrants from Detention or COVID-19 Will Spread Like Wildfire Inside*, DEMOCRACYNOW, ECF No. 14-1;

4. Ken Klippenstein, *Exclusive: ICE Detainees Are Being Quarantined*, THE NATION, ECF No. 14-3 (ICE has been quarantining detainees at 10 different facilities, suggesting that there may be outbreaks);

5. Scott A. Allen & Josiah D. Rich,  Letter to House Committee on Homeland Security, ECF No. 14-4 (letter from infectious disease specialists urging immediate mitigation strategies to slow the spread of COVID-19 within immigration detention facilities);

6. Julie Mack, *Another Big Jump in Michigan Coronavirus Numbers: Now at 2,295 Cases; 43 Deaths*, MLIVE (Mar. 25, 2020), ECF No. 14-5;

7. Open Letter to ICE from [3,014] Medical Professionals Regarding COVID-19, ECF No. 14-6, at PageID.398 (urging the release of "[i]ndividuals and families, particularly the most vulnerable – the elderly, pregnant women, people with serious mental illness, and those at higher risk of complications");

8. Dara Lind, *ICE Detainee Says Migrants Are Going on a Hunger Strike for Soap*, PROBULICA, ECF No. 14-6; and

9. Gregory Bull, *Coronavirus: SF D.A., Activists, Doctors Call for Undocumented Immigrants' Release*, ASSOCIATED PRESS, ECF No. 14-11.

On March 23, 2020, the Centers for Disease Control and Prevention (CDC) acknowledged

that detention facilities "present [] unique challenges for control of COVID-19 transmission among

incarcerated/detained persons, staff, and visitors." *Interim Guidance on Management of

Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Ctrs. for Disease

Control (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-

detention/guidance-correctional-detention.html.  "The CDC noted that many detention conditions

create a heightened risk of danger to detainees. These include: low capacity for patient volume,

insufficient quarantine space, insufficient on-site medical staff, highly congregational

environments, inability of most patients to leave the facility, and limited ability of

incarcerated/detained persons to exercise effective disease prevention measures (e.g., social

distancing and frequent handwashing)." *United States v. Kennedy*, No. 18-20315, 2020 WL 1493481, at *2 (E.D. Mich. Mar. 27, 2020) (Levy, J.).

Both detention facilities at issue — Calhoun and St. Clair — are located within jail complexes where vendors, visitors, attorneys, clergy, and correctional facility staff come and go on a daily basis, according to the petitioners. The government advises, however, that visits are restricted presently and inmates have no direct contact with people from outside the facilities. The petitioners maintain that there is no coronavirus screening testing for new detainees, nor is there coronavirus testing provided to the facility staff. ICE reported that coronavirus testing is provided only when symptoms manifest, which, according to the World Health Organization, is 5 to 14 days after the virus is contracted.

Awshana and Hamana are both detained in the Calhoun Facility. The facility has two types of dorms. The first type contains 30 to 40 cells that house two people each. The second type of dorm "has simple bed rows that each have 8 to 16 people." All detainees share common eating and social areas. The petitioners report that they have no masks to wear, people come and go every day, they must share five phones among each other, and there is only one sink for everyone to wash their hands. Although the facility has hand sanitizer, detainees are not allowed access to it after 5:00 p.m. They wear the same jumpsuits every day, which are washed twice a week. The petitioners allege that the facilities in the St. Clair County jail, where Al-Sadoon is held, "are virtually identical to those at Calhoun County."

Through this morning, Calhoun County has reported 541 total cases of COVID-19 and one death, and St. Clair County reported 140 cases and 3 deaths. *See* Coronavirus, Michigan.Gov, https://www.michigan.gov/coronavirus/0,9753,7-406-98163-520743--,00.html

2.  Steps Taken to Ameliorate the Situation

Jennifer Moon, the Deputy Assistant Director for Healthcare Compliance with ICE Health Service Corps (IHSC), filed a declaration describing the steps ICE has taken to stem the spread of COVID-19 within the Calhoun and St. Clair County detention facilities.

Following guidance from the CDC, facility staff assess detainees for fever and respiratory illness during intake medical screenings.   Detainees are also asked if they traveled through areas with sustained community spread or if they had close contact with anyone with a laboratory-confirmed COVID-19 diagnosis within the past two weeks.  Asymptomatic detainees with known exposure to COVID-19 "are placed in cohorts with restricted movement for the duration of the most recent incubation period (14 days after most recent exposure to an ill detainee) and are monitored daily for fever and symptoms of respiratory illness."  Those detainees who present with symptoms associated with COVID-19 are placed in isolation where they will be tested.  And if they test positive, they will remain isolated, treated, and hospitalized if necessary.  And on Friday, March 13, 2020, the Federal Bureau of Prisons announced that incarcerated people will not be allowed visits from family, friends, and attorneys for 30 days.  *Federal Bureau of Prison Action Plan,* Federal Bureau of Prisons, (Mar. 13, 2020),   https://www.bop.gov/resources/news/ 20200313_covid-19.jsp.

The facilities, working with their local Health Departments, also provide staff and detainee services to help curb the spread of the virus.  Calhoun County and St. Clair County provide education on COVID-19, which includes guidance on identifying symptoms and the importance of hygiene.  The facilities also provide daily access to sick calls, specialty services, and hospital care.

ICE also insists that the conditions at the detention facilities are adequate. The facilities maintain "populations within their approved capacities and are not overcrowded." And they both provide "disinfectants, soap, and personal protective equipment when needed."

### IV. Petitioners' Individual Circumstances

The petitioners argue that the conditions at the Calhoun and St. Clair detention centers subject them to a heightened risk of contracting COVID-19, going so far as calling the facilities soon-to-be "death camps." That language does little to advance the arguments, but the Court is mindful of the petitioners' legitimate concern — shared by society in general — over minimizing exposure to the novel coronavirus. The increasing number of courts that have addressed pleas for release because of the fear of COVID-19 infection have ruled both ways, denying relief when the concern is too generalized, and granting relief when specific and heightened risks of exposure to complications have been shown. Courts have been more inclined to grant relief where the detention facility has reported confirmed cases of COVID 19 or where the petitioners fall into one of the high-risk categories for COVID-19. *See decisions granting relief*: *Jones*, 2020 WL 1643857 (W.D.N.Y.) (granting relief for detainees with chronic medical conditions held in a detention facility with no confirmed COVID-19 cases); *Basank*, 2020 WL 1481503 (S.D.N.Y.) (granting relief for detainees with chronic medical conditions held in a facility with confirmed cases of COVID-19); *Coronel*, 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020) (same); *Malam v. Adducci*, --- F. Supp. 3d ---, No. 20-10829, 2020 WL 1672662, at *1 (E.D. Mich. Apr. 5, 2020), *as amended* (Apr. 6, 2020) (granting relief for petitioner in high-risk category but held in facility with no confirmed cases); *and see decisions denying relief*: *Dawson v. Asher*, No. 20-0409, 2020 WL 1304557 (W.D. Wash. Mar. 19, 2020) (denying petition where petitioners were not in high-risk group and no detainees or staff at the facility at issue tested positive for COVID-19); *Sacal-Micha*

*v. Longoria*, No. 20-37, 2020 WL 1518861 (S.D. Tex. Mar. 27, 2020) (same); *Xuyue Zhang v. Barr*, 2020 WL 1502607, at *4 (C.D. Cal. Mar. 27, 2020) (denying relief for petitioners in high-risk categories held a detention facility with no confirmed cases of COVID-19).

That pattern is consistent with a deliberate indifference analysis. Objectively, the health risks posed by COVID-19 are abundantly clear. The parties do not dispute that the virus is particularly dangerous to those over 65 years old or with certain underlying health conditions. *See People Who Are at Higher Risk for Severe Illness*, *supra*. There is no vaccine to prevent COVID-19, nor is there a known cure or antiviral treatment at this time. *Ibid.* Dr. Fauci estimated on March 31, 2020, that between 100,000 and 240,000 will die of COVID-19. Shear et al., *supra.* And the Southern and Western Districts of New York have "take[en] judicial notice that, for people of advanced age, with underlying health problems, or both, COVID-19 causes severe medical conditions and has increased lethality." *Basank*, 2020 WL 1481503, at *3 (S.D.N.Y.); *Jones*, 2020 WL 1643857, at *8 (W.D.N.Y.).

The petitioners are also housed in a manner that increases their risk of exposure to the coronavirus. They are held in the general population of the Calhoun County and St. Clair County detention centers, use shared restrooms, and are confined in shared cells or dorm-style housing. Government experts agree that such a communal style of living can increase the infection rate. *See Former ICE Director: Release Immigrants from Detention or COVID-19 Will Spread Like Wildfire Inside*, DEMOCRACYNOW, ECF No. 14-1; *FAQs for administrators, staff, people who are incarcerated, families*, Ctrs. for Disease Control and Prevention (Mar. 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/faq.html.

However, unlike the petitioners in the cases for which courts granted relief, the petitioners in this case do not allege that they are in a high-risk category as defined by the CDC. Petitioners

Awshana and Hamana, presently detained at the Calhoun County Detention Center, have not alleged that any detainees or staff have tested positive for the illness in that detention facility. The petitioners assert generally that they "are older adults and/or people with medical conditions who are at particularly grave risk of severe illness or death if they contract COVID-19." But they never have alleged that any of them suffered from a medical condition that placed them in a high-risk category, per the CDC's guidelines. As of July 2019, Hamana was 39 years old. And although the parties never stated the Awshana's age, he never claimed that he was over 45. *See People Who Are at Higher Risk for Severe Illness*, *supra.* Despite Awshana's assertions that his medical condition has deteriorated over the past two weeks, he was given consistent medical attention. After visiting the clinic at the Calhoun facility six times over the course of nine days, medical staff never noted that he presented any symptoms beyond seasonal allergies or dehydration. Although the seriousness of the pandemic cannot be doubted, petitioners Awshana and Hamana are in an objectively better situation than the petitioners in *Jones*, *Basank,* and *Coronel*, who were either in high-risk categories, were held in facilities with confirmed cases, or both.

Petitioner Al-Sadoon's circumstances are different, because the United States Marshal reported on Wednesday that two inmates at the St. Clair County jail tested positive for COVID-19. An ICE Assistant Field Office Director reports that each inmate was isolated in his respective housing unit, and that Al-Sadoon does not reside in either unit. No further information was provided. The government will be required promptly to investigate and report to the Court and petitioners' counsel the details. Al-Sadoon has not alleged that he falls in one of the high-risk categories that portend complications from a coronavirus infection. He is approximately 32 years old.

To satisfy the subjective element of their claim, the petitioners must demonstrate that the government subjected them to objectively poor confinement conditions with deliberate indifference to their health and safety. *Farmer*, 511 U.S. at 834. There is no doubt that the respondents are aware of the grave threat posed by the pandemic and the exacerbated risk caused by the close quarters of the detention facilities. *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/ correction-detention/guidance-correctional-detention.html (last visited April 8, 2020) (explaining that measures ordered by the CDC to reduce person-to-person contact present unique challenges for prisons and detention facilities, because "[i]ncarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced").

According to Deputy Assistant Director Moon, the government has put in place specific measures to stem the spread of the pandemic. Following CDC guidance, Calhoun and St. Clair facility staff assess detainees for fever and respiratory illness during intake medical screenings and ask about any possible exposure to the virus. Those with confirmed exposure will be segregated in separate cohorts with restricted movement for the duration of the most recent incubation period (14 days after most recent exposure to an ill detainee). And the government will place detainees who present with COVID-19 symptoms in isolation where they are tested and treated if necessary. However, while these measures are certainly commendable, "the fact is that none of the steps [taken] . . . includes the 'social distancing measures recommended — especially for high-risk individuals — by the CDC . . ." *Jones*, 2020 WL 1643857, at *10 (W.D.N.Y.). It is unlikely that any operating detention facility will be able to achieve that goal.

## V. Release as a Remedy

The premise of this habeas corpus petition is that the conditions of confinement in these ICE detention facilities are so intolerable because of the risk of contracting COVID-19 that release is the only remedy. With appropriate proof, that may indeed be true. But the petitioners have leveled only generalized allegations; if those were deemed sufficient, then all inmates would be entitled to release until the pandemic subsides. The petitioners have not stated as much in so many words, but neither have they attempted to articulate any limiting principle.

Limits, however, are imposed by the Due Process Clause itself, and the manner of its application. The seminal case dealing with the constitutionality of conditions of confinement of non-convicted detainees is *Bell v. Wolfish,* 441 U.S. 520 (1979). There, the Supreme Court held that such claims are governed by the Due Process Clause, a proposition that is now well accepted. *See*, *e.g.*, *Phillips v. Roane County*, 534 F.3d 531, 539 (6th Cir. 2008) (reiterating that when a conditions-of-confinement claim "is asserted on behalf of a pre-trial detainee, the Due Process Clause . . . is the proper starting point"). But the Court also emphasized that those constitutional rights implicated by conditions of confinement, when analyzed for pretrial detainees under the Due Process Clause, must be balanced against the "Government['s] . . . legitimate interests that stem from its need to manage the facility in which the individual is detained." *Bell*, 441 U.S. at 540. Courts, therefore, must strike a balance "between institutional needs and objectives and the provisions of the Constitution that are of general application." *Id.* at 546 (quoting *Wolff v. McDonell*, 418 U.S. 539, 556 (1974)). In striking that balance, courts must give great deference to the custodians "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security," *id.* at 547, lest courts become "enmeshed in the minutiae of prison operations." *Id.* at 562.

The institutional interests here circle back to ICE's interest in continuing the detention of those removable aliens whom the Secretary determines "to be a risk to the community or unlikely to comply with the order of removal." 8 U.S.C. § 1231(a)(6). When considering the remedy of a complete release from detention (albeit with conditions for supervision), the Court must strike a balance between the gravity of the risk of contracting COVID-19 (with uncertain outcomes for recovery and a path that could lead to death) with the danger to the public that could result from releasing the petitioners into the community. The petitioners each contend that they are neither a danger nor a flight risk. In light of those arguments, it is relevant to review their backgrounds. The following information came from the petition and declarations furnished by the respondents.

A. Oliver Nissan Awshana

According to the declaration of deportation officer Christopher Labadini, Oliver Nisan Awshana came to the United States as a refugee on April 20, 2009, and became a lawful permanent resident on January 21, 2011. He has not revealed his age, but there is no allegation that he is over 45 years old.

1. Immigration Proceedings

Awshana was convicted of possession of cocaine and two counts of retail fraud in the second degree in state court. Due to his convictions, the Bureau of Immigrations and Customs Enforcement (ICE) detained Awshana in April 2018 and placed him in removal proceedings under 8 U.S.C. § 1227(a)(2). He filed applications for relief from removal, but the Immigration Court denied them on August 2, 2018, and ordered him deported to Iraq. Awshana's removal was scheduled to occur on April 23, 2019.

On April 1, 2019, Awshana filed a petition for a writ of habeas corpus in the Northern District of Ohio under 28 U.S.C. § 2241. He argued that his continued detention under 8 U.S.C. §

1231(a) was unlawful and that he should be released from ICE custody because the United States was unable to obtain travel documents necessary to remove him to Iraq. The district court in Ohio denied the petition on July 10, 2019.

ICE began the physical removal process on April 23, 2019, flying Awshana from Detroit to Chicago. But Awshana "refus[ed]" to board the plane for his trip to Iraq from Chicago. So ICE transferred him to the Calhoun County Detention Center in Battle Creek, Michigan, where he remains in custody.

Three days later, on April 26, Awshana filed two motions with the Immigration Court in Detroit, Michigan: the first to reopen his case, and the second to stay his removal proceedings. On April 30, 2019, the Immigration Court granted Awshana's motion to stay his removal, and on May 14, 2019, the court reopened his immigration case.

After holding hearings in November and December 2019, the Immigration Court issued a written decision on February 4, 2020, granting Awshana's applications for withholding of removal under the Immigration and Nationality Act and alternatively withholding removal under the United Nations Convention Against Torture due to the deteriorating conditions in Iraq. The court concluded that Awshana would face torture and persecution in Iraq because he is a Christian, he will be identified as a supporter of the United States, and he has no social network to protect him in Iraq. ICE then filed a notice of appeal with the Board of Immigration Appeals (BIA) on March 3, 2020. The appeal currently is pending, awaiting the issuance of the BIA's briefing schedule and hearing transcripts.

## 2. Medical History at Calhoun Detention Facility

In a reply to the government's response, Awshana asserts that his medical condition has deteriorated over the past two weeks while at the Calhoun Detention Center. His attorney alleges

that when she visited him on March 20, 2020, he looked "sick." He allegedly had a fever, a runny nose, and a cough, and he had difficulty swallowing, was sweating profusely, and was slightly jaundiced. The government adamantly disputes this account, contending that attending nurses saw nothing wrong with Awshana, aside from seasonal allergies and dehydration. The government detailed Awshana's recent medical history in its sur-reply:

> March 20, 2020: Awshana visited the clinic complaining of a stuffy nose and nausea that started the day before. He denied being around anyone that had been sick. "The practitioner noted that it appears Awshana has allergic rhinitis and that there are no signs of infection." He was prescribed Cetirizine for his allergy symptoms and was told to increase his fluids.

> March 24, 2020: Awshana visited the clinic complaining about sneezing and fatigue. He denied having a cough or nausea. He stated that he gets dizzy after laying down and rising quickly. He also admitted that he had only been drinking three glasses of water because it tastes bad.

> March 25, 2020: Awshana visited the clinic for unusual behavior. He denied feeling suicidal or homicidal. But he reported feeling anxious and wanted to be released.

> March 26, 2020: He visited the clinic again for unusual behavior. He complained of "feeling bad," that his ears were plugged, and that he had been coughing. No cough was noted during the encounter. He was housed and placed in observation.

> March 26, 2020: Awshana returned to the clinic by the request of command staff, as he had been kiting the night before stating that he needed to go to the hospital. He appeared very anxious, had no fever, was slightly tachycardic, and said he was not sleeping. He did not cough during the exam or observation period. He received an x-ray of his chest, which came back normal. He was cleared and returned to general population.

> March 29, 2020: Awshana visited the clinic complaining about a cold or the flu. He claimed that he had a fever, chills, nasal drainage, and a cough. A physical exam showed that his vital signs were fine, and the nurse did not detect a cough, runny nose, or congestion. No signs or symptoms of a cold or the flu were noted.

### B.  Ali Najim Al-Sadoon

Ali Najim Al-Sadoon is an Iraqi Shi'a Muslim.  He and his family fled Iraq and sought refuge in the United States on June 23, 1994.  He is roughly 32 years old.  He has not identified any health problems.

#### 1.  Immigration Proceedings

After being convicted of safe breaking and breaking and entering in state court, ICE initiated removal proceedings against Al-Sadoon on August 20, 2013, charging him as removable under 8 U.S.C. §§ 1227(a)(2).  He did not contest the charges.  While Al-Sadoon was serving his sentence, an Immigration Judge in Detroit ordered him removed on March 24, 2015.  Al-Sadoon waived his right to appeal the decision and was transferred from the custody of the Michigan Department of Corrections (MDOC) to ICE on May 17, 2016.

Al-Sadoon moved to reopen his removal proceedings in September 2017, and an Immigration Judge denied the motion on November 8, 2017.  Al-Sadoon appealed the decision to the BIA but withdrew his appeal on August 31, 2018.

In the meantime, Al-Sadoon was a member of a class action lawsuit filed in this Court in 2018 in which Iraqi aliens in ICE custody sought a writ of habeas corpus to preclude their detention pending removal.  *See Hamama v. Adducci*, No. 17-11910 (E.D. Mich.) (Goldsmith J.).  Judge Goldsmith granted the petitioners' motion for a preliminary injunction on November 20, 2018. *See Hamama v. Adduci*, 349 F. Supp. 3d 665 (E.D. Mich. 2018) (Goldsmith, J.)*, vacated and remanded*, 946 F.3d 875 (6th Cir. 2020).  Per the order, ICE released Al-Sadoon from custody and placed him on a GPS tether.

The Iraqi government then issued a one-way *Laissez-Passer* travel document for Al-Sadoon's removal on March 13, 2019.  The travel document was valid for six months.

Al-Sadoon was ordered to report to the Detroit Metropolitan Airport on June 23, 2019, at 4:00 p.m. for removal.  But he had filed on June 20, 2019 in the Immigration Court in Detroit a motion to reopen and a motion to stay his removal.  Because he had not yet heard from the immigration court, Al-Sadoon cut his tether on the morning of June 23 and did not report to the airport as instructed.  The immigration court denied Al-Sadoon's motion to reopen removal proceedings on June 25.  ICE officers found Al-Sadoon at his house about a month later on July 26, 2019.  He barricaded himself in his home using a couch and a washing machine.  A Special Response Team had to break in to arrest him.

The government filed a criminal complaint charging Al-Sadoon with hampering removal in violation of 8 U.S.C. 1253(a)(1)(C).  The court denied bond on August 5, 2019, finding that Al-Sadoon was a flight risk and danger to the community.  The court eventually dismissed the indictment on the government's motion "to allow ICE to effectuate [Al-Sadoon's] removal."

Al-Sadoon was then re-detained by ICE on December 18, 2019.  But on January 10, 2020, the BIA granted Al-Sadoon's request for a stay of removal, pending the decision of Al-Sadoon's appeal of the immigration court's June 25, 2019, denial of his motion to reopen removal proceedings.  Al-Sadoon's removal, which was planned on January 12, 2020, was therefore cancelled.

Al-Sadoon currently is detained at the St Clair Detention Center.  Most recently, on February 14, 2020, Judge Goldsmith explicitly authorized his continued detention in a sealed order in the ongoing class action.

## 2. Criminal History

In addition to the hampering removal charge, Al-Sadoon has an extensive criminal history. He has been arrested for the following conduct:

August 2, 2001: arrested by Dearborn, Michigan, police for "an offense related to a stolen vehicle." Al-Sadoon received a juvenile order of guilt for receiving and concealing stolen property valued at $20,000 or more;

December 6, 2003: arrested by Detroit, Michigan, police for "a public order crime";

December 9, 2004: arrested by Dearborn police and convicted of unlawfully taking a motor vehicle without authority;

December 4, 2006: arrested and convicted of "domestic violence in Detroit";

January 23, 2007: arrested by Detroit police and convicted of "larceny in a building and breaking and entering a building";

July 6, 2007: arrested by Detroit police "for an offense relating to assault";

July 7, 2007: arrested by Dearborn police and convicted of "operating a vehicle with no license or multiple licenses";

July 17, 2007: arrested by Detroit police "for a traffic offense";

September 26, 2007: arrested by Detroit police for an "offense related to the obstruction of justice";

December 3, 2007: arrested by Detroit police for "an offense related to robbery";

June 8, 2008: arrested by Detroit police "for a public peace offense";

June 23, 2008: arrested by Detroit police for "a dangerous drugs offense";

August 14, 2008: arrested by Detroit police and convicted of "breaking and entering by illegal entry without the owner's permission";

October 19, 2008: arrested by Detroit police for "an offense related to burglary";

December 4, 2008: arrested by the Detroit police for "an offense related to obstruction of justice";

December 9, 2008: arrested by Detroit police for "a traffic offense";

January 9, 2009: arrested by Detroit police for "an armed robbery offense";

January 29, 2009: arrested by the Westland, Michigan, police "for a traffic offense";

February 20, 2009: arrested by the Dearborn police for traffic and controlled substance related offenses, resulting in a conviction of "operating a vehicle with a suspended, revoked or denied license";

March 28, 2009: arrested by Sidney, Ohio, police and convicted of "fleeing a police officer in a vehicle";

April 9, 2009: arrested by Dearborn police and convicted of "fleeing a police officer in a vehicle";

April 15, 2009: arrested by Dearborn police and convicted of "operating while intoxicated and controlled substance possession";

June 5, 2009: arrested by Dearborn police and convicted of "operating a vehicle with no license or multiple licenses";

June 15, 2011: arrested by Wayne, Michigan, police and convicted of "breaking and entering outside a showcase";

September 27, 2011: arrested by Dearborn police for a "public peace offense";

October 26, 2011: arrested by the Dearborn police department for safe-breaking — convicted and sentenced to three years and six months to 15 years imprisonment with the MDOC; and

April 16, 2012: arrested by Redford, Michigan, police for breaking and entering — convicted and sentenced as a habitual offender to three years and six months to 15 years imprisonment with the MDOC.

The last two convictions were the basis of the removal proceedings.

## C. Wisam Gharib Hamana

Wisam Gharib Hamana is an Iraqi Christian who, along with his family, was granted asylum in 1983. He is around 39 years old. He left Iraq when he was eight weeks old. He does not speak Arabic or Chaldean fluently and knows little about Iraqi social and cultural norms. On July 27, 1984, he became a lawful permanent resident of the United States. He has not identified any health problems.

### 1. Immigration Proceedings

ICE began removal proceedings against Hamana on August 6, 2010, charging him as removable under 8 U.S.C. § 1227(a)(2)(A)(ii) and (B)(i) based on convictions of "controlled substance offenses," receiving and concealing stolen property, and retail fraud. On September 29, 2010, an immigration judge ordered his removal from the United States. The case was reopened in August 2017, and on February 26, 2018, an Immigration Judge again ordered his removal.

Like Al-Sadoon, Hamana was a class member in the *Hamama* class action before Judge Goldsmith. After Judge Goldsmith granted the petitioners' motion for a preliminary injunction on November 20, 2018, ICE released Hamana from custody on December 19, 2018, and placed him on a GPS tether.

On March 13, 2019, the Iraqi government issued a one-way, *Laissez-Passer* travel document for Hamana's removal from the United States, which was valid for six months. ICE scheduled Hamana's removal to begin on June 25, 2019, and instructed him to meet ICE officers at the Detroit Metropolitan Airport that day at 3:30 p.m.

Hamana filed a motion to reopen and a motion to stay his removal with the immigration court in Detroit on June 18, 2019, several days before he was scheduled to leave. The immigration

court denied both motions on June 24, 2019. Hamana appealed, and the BIA denied his request to stay his removal proceedings pending his appeal of the Immigration Court's decisions.

Hamana never reported to the airport on June 25, 2019, as ordered. Instead, he cut his tether around 6:40 p.m. Acting on a complaint and warrant charging him with hampering removal in violation of 8 U.S.C. 1253(a)(1)(C), ICE found Hamana and arrested him about a month later on July 22, 2019. Hamana was arrested without further incident. Two days later, a magistrate judge in this district detained Hamana pending trial on his criminal charges, finding that he was a flight risk and posed a danger to the community. Hamana was indicted on the hampering removal charge on August 6, 2019.

On November 25, 2019, the Iraqi government issued another six-month travel document for Hamana's removal. ICE arranged to deport him on February 9, 2020, and the government dismissed its indictment against him on January 8, 2020, to facilitate his removal.

ICE re-detained Hamana on January 14, 2020. But days before his second deportation date, Hamana filed a supplemental motion with the BIA for an emergency stay on February 6, 2020. He argued that his family had been granted the right to emigrate to Italy before coming to the United States and asked that he be removed there instead of Iraq. Luck was on his side, it seems, because the next day, the flight that ICE booked to remove him was cancelled. And that same day — February 7, 2020 — the BIA granted Hamana's request to stay removal pending his appeal of the Immigration Court's June 24, 2019, denial of his motion to reopen removal proceedings.

Hamana currently is detained by ICE at the Calhoun County Detention Facility. Most recently, on March 31, 2020, Judge Goldsmith explicitly authorized his continued detention in a sealed order in the ongoing class action.

## 2. Criminal History

In addition to his hampering removal, it appears that Hamana also has a criminal record:

July 21, 1998: arrested by Troy, Michigan, police and convicted of "retail fraud";
June 7, 2002: arrested by Oakland County, Michigan, sheriffs and convicted of "receiving and concealing stolen property";
 July 13, 2002: arrested by the Warren police and convicted of "controlled substance offenses";
July 24, 2003: arrested by Hazel Park, Michigan, police and convicted of "disorderly conduct";
July 19, 2010: arrested by Warren police and convicted of "assault with a dangerous weapon and controlled substance possession";
October 21, 2011: arrested by Warren police and convicted of "assault with a dangerous weapon"; and
January 18, 2013: arrested by Detroit police and convicted of "receiving and concealing a motor vehicle."

The first three entries are the convictions that served as a basis for Hamana's removal.

\* \* \* \* \*

In normal times, the petitioners' respective criminal records, interference with supervision, and resistance to lawful deportation orders would justify their continued detention. When striking the balance between ICE's institutional need for continued detention and the petitioners' legitimate concerns over an unreasonable risk of serious damage to their future health, it is fair to require the petitioners to articulate something more than a generalized fear of exposure to disease in a detention facility. That only makes sense, since "the requirements of due process are fluid and fact dependent." *Shoemaker v. City of Howell*, 795 F.3d 553, 559 (6th Cir. 2015). A detainee who poses a greater flight risk or danger to the community will need to make a stronger showing of risk to his life and health to win release.

In their criticism of the government, the petitioners point only to the lack of social distancing measures implemented at the facilities. They have not argued that the government ignored their high-risk status, failed to treat someone suffering from COVID-19 adequately, or ignored the threat level when someone associated with the detention facilities tested positive for

the virus. In fact, the briefings reveal the opposite. The Calhoun facility medical staff were attentive to Awshana's complaints, caring for him each time he visited the clinic, monitoring his condition, providing advice about managing his hydration levels, and giving him allergy medications.

To prevail, the petitioners must show that the government, "with deliberate indifference, exposed [them] to [an environment] that pose[s] an unreasonable risk of serious damage to [their] future health." *Helling*, 509 U.S. at 35. Petitioners Awshana and Hamana have not done so; they have not offered specific proof that the respondents' facilities "[are] incapable of protecting [them] from contracting COVID-19 or providing appropriate medical attention should [they] be infected." *Sacal-Micha*, 2020 WL 1518861, *5 (S.D. Tex.). The petitioners offer only conclusory arguments based on articles regarding the contagious nature of COVID-19 and the potential to spread in detention facilities. But none of the exhibits concern the Calhoun or St. Clair detention centers specifically. The relatively healthy petitioners are left with the argument that the government acted with deliberate indifference by failing to implement social distancing measures in its facilities in which no one tested positive for COVID-19.

More information is needed to assess petitioner Al-Sadoon' claim.

## VI. Conclusion

The petitioners understandably seek release from their crowded detention facilities as the world reels from the effects of the global coronavirus pandemic. And courts across the country have released inmates and civil detainees to stem the spread of COVID-19. But in the immigration context, courts have released only those individuals who fell within one of the CDC's high-risk categories, were housed in detention facilities with confirmed cases, or both. Petitioners Awshana and Hamana do not fit this mold: they are relatively healthy people detained in facilities with no

confirmed cases.  And when one of them sought medical attention, it was promptly provided. Petitioners Awshana and Hamana have not shown that the are in custody in violation of the Constitution.  Therefore, they are not entitled to relief under 28 U.S.C. § 2241.

Petitioner Al-Sadoon's claim is on a slightly different footing.  There are reports of a confirmed case of COVID-19 at the St. Clair County detention facility.  That changes the nature of the concern beyond mere generalities.  But more information is required to determine if release is an appropriate remedy.

Accordingly, it is **ORDERED** the petition for a writ of habeas corpus (ECF No. 1) is **DENIED** as to petitioners Oliver Nissan Awshana and Wisam Gharib Hamana, **only**.

It is further **ORDERED** that the respondents must furnish to the Court and petitioners' counsel by **noon on Friday, April 10, 2020**, detailed information describing the extent of CIVID-198 infestation at the St. Clair County jail, including the number of suspected and confirmed cases, the location of the infected inmates, whether petitioner Al-Sadoon was present in any areas visited by the infected inmates within the last 14 days, the steps taken to address the infections, the number of inmates in each housing unit (including the housing units where those inmates with confirmed COVID-19 cases are quarantined), and all remedial measures undertaken at the facility in light of the presence confirmed or suspected cases.

It is further **ORDERED** that petitioners Awshana and Hamana may reapply for appropriate relief under this case number of conditions at the Calhoun County Detention Facility change with respect to suspected or confirmed cases of COVID-19 at that facility.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  April 9, 2020